## SHAW *v.* BILL.

1. The appearance of counsel specially for a corporation, and his moving to dis-
miss the petition of an individual creditor for the appointment of a receiver
of its property, do not preclude him from subsequently appearing for the
trustee of the bondholders in proceedings to foreclose mortgages given by
the corporation.

2. Upon a supplemental bill in chancery, a subpœna is not required unless new
parties are made. A rule upon parties already served to answer the sup-
plemental bill is sufficient.

3. Where a corporation is insolvent, and has no funds at the place where its bonds
are payable, demand of payment at such place need not be made before suit
brought to foreclose its mortgages executed to secure the bonds.

4. A mortgage by a railroad corporation which in terms covers "all the follow-
ing, present, and in future to be acquired property" of the corporation,
naming in the description of such property its engines, cars, and machinery,
carries not only the cars, engines, and machinery in existence at the date of
the mortgage, but such as take their place or are subsequently added to them
by the company and are in existence at the time of the foreclosure.

APPEAL from the Circuit Court of the United States for the
District of Indiana.

In 1849, the New Albany and Salem Railroad Company was

incorporated under the laws of Indiana, with power to construct a railroad from New Albany, on the Ohio River, to Michigan City, on Lake Michigan. To enable the company to raise the necessary means to complete and equip the road, it issued at different times a large amount of bonds, secured by mortgages upon its property. There were five issues of bonds, varying in amount from $500,000 to over $2,000,000, and carrying interest from seven to ten per cent per annum, payable semi-annually. Each issue was secured by a separate mortgage. The first mortgage was executed in February, 1851; the second, in February, 1852; the third, in November, 1853; the fourth, in February, 1855; and the fifth, in December, 1856. They were all made to Douw Williamson, as trustee for the bondholders, the complainant, Charles E. Bill, being named as substitute or successor, in whom the estate and the powers of the trustee were to vest in case of the death, incapacity, or resignation of Williamson.

The several bonds as they matured, and the interest stipulated, not being paid, the trustee, in August, 1857, filed a bill in the Circuit Court of the United States for the District of Indiana, for the foreclosure of the several mortgages. The corporation was served with process of subpœna, appeared to the suit and demurred to the bill. It does not appear from the record what disposition was made of the demurrer, but it is to be inferred from the subsequent proceedings that it was abandoned. At any rate, in December of the following year (1858), a decree was entered in the case by consent of parties, — one not foreclosing the mortgages as prayed in the bill, but declaring the rights and interests of the bondholders and stockholders under the several mortgages, — in accordance with what was termed a basis of adjustment and settlement, proposed to them by the president and directors of the company. The practical effect of the decree was to extinguish all the liens upon the property of the company, except such as were created by the first and second mortgages; to provide for a reorganization of the company, and to convert the subsequent bonds into common stock of the reorganized company.

Before this decree was rendered, the bondholders, waiving their priority, had consented to an interlocutory decree, entered

in June, 1858, authorizing the trustee to borrow $200,000 to pay certain unsecured debts, and to hold possession of the mortgaged property until this loan should be repaid with interest. The decree of December, 1858, provided for the prior payment of this sum, and also of a mortgage of another company for $175,000, which had been previously assumed.

Nearly ten years afterwards, in August, 1868, the bondholders secured by the first and second mortgages, or at least a large portion of them, demanded that the trustee should take proceedings to foreclose those mortgages. The trustee, acting upon the assumption that the original suit, brought in the Circuit Court for that purpose in 1857, was ended by the decree of December, 1858, commenced suit for the foreclosure desired, in a court of the State of Indiana. That suit proceeded to a final decree, under which the property was sold in May, 1869. The purchasers organized themselves under the law of Indiana into a new company, called the Louisville, New Albany, and Chicago Railway Company, which held possession of the property until it was transferred to a receiver, upon the application of the appellant, John S. Shaw. This appellant held a bond of the fourth-mortgage issue, and some stock of the company issued for bonds surrendered under the decree of December, 1858. Upon his petition, purporting to be filed on the foot of that decree, and alleging various irregularities and fraudulent practices on the part of the trustee and the first and second mortgage creditors, a receiver of the property of the company was appointed. His position was that the railroad property was placed under the exclusive wardship of the Circuit Court of the United States, by virtue of the two decrees of June and December, 1858, and that, consequently, the foreclosure proceedings in the State court were irregular and void. Ultimately, and after protracted litigation, this view of the appellant was sustained by the Circuit Court. It is unnecessary to detail the various steps taken by the parties upon the petition of Shaw. It is sufficient to mention that they led Charles E. Bill, the successor of the original trustee, to apply for leave to file a supplemental bill for the foreclosure of the mortgages remaining in force, and that his application was granted. It is upon the subsequent proceedings, resulting in a final decree of foreclosure,

from which Shaw and others appealed, that the questions arise for determination here.

*Mr. Samuel A. Huff* for the appellants.

1. The decree against the Louisville, New Albany, and Chicago Railroad Company is erroneous, because it appears that the company was defaulted at the instance of counsel who had theretofore appeared specially for the company, and process of subpœna upon the supplemental bill was not taken out against the company before such default, nor at any time thereafter.

2. The supplemental bill upon which the final decree is founded shows upon its face that the complainant trustee, and those in whose behalf he prosecuted it, are not entitled to the relief therein prayed, nor to any relief whatever. It does not even aver that a demand of payment of the bonds was made when they were payable.

3. In the final decree, the provisions of the several mortgages touching the property covered by them respectively are wholly disregarded by the court in this, to wit, —

*a.* The mortgage of 1851 and that of 1852, being the first and second of the series, in express terms limit their respective operation as to the future-acquired property of the company to such as may be purchased with the bonds thereby secured, or with the money obtained therefor.

*b.* The mortgages of 1853 and 1855, being the third and the fourth of the series, pledged, as security for the payment of the bonds by them respectively secured, the property that might be purchased with such bonds, or with money obtained therefor.

Whereas, by the final decree of the Circuit Court, the mortgages of 1851 and 1852 are held to cover all the property of the company, whether acquired by purchase with the bonds secured by the subsequent mortgages, or with money obtained for such latter bonds, or otherwise.

4. The parties in whose sole behalf the decree was passed, having, before the filing of the supplemental bill upon which it rests, surrendered the bonds secured by the mortgages foreclosed in their behalf, in such form as to forfeit their standing in court, should therefore have been denied any relief.

*Mr. Henry Crawford, contra.*

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court:

It seems from the record, that, when the petition of Shaw for the appointment of a receiver was presented to the court, Mr. Hendricks, with others, appeared as special counsel for the company, and moved its dismissal. Subsequently, Mr. Hendricks appeared as counsel for the trustee in the proceedings on the supplemental bill for the foreclosure of the mortgages, and on his motion the default of the company was entered. This second appearance of counsel against the company is regarded by the appellant as exhibiting "an anomaly in chancery practice" so great as to vitiate the decree. We do not perceive any anomaly or irregularity or impropriety in the conduct of the counsel. He might very well have appeared for the company to defeat a petition of a single creditor asking for the appointment of a receiver of its property, and yet subsequently have appeared for the trustee to foreclose its mortgages. There was nothing in the duties required on the motion which in any way conflicted with the duties required in the subsequent proceedings. There is not even a colorable pretext for calling in question the propriety of the action of counsel.

The fact that process of subpœna was not issued upon the supplemental bill is of no consequence. Such process is only necessary where new parties are brought in. The supplemental bill is a mere adjunct to the original bill, and, where the parties have already been served, no further subpœna for them is required. In this case, the company was ruled to answer; and the new parties appeared by counsel, and both demurred and answered. The fact that leave was granted upon motion of counsel to issue a subpœna against the company some months after its default had been entered, does not alter the case. Nothing appears to have been done upon the leave, and it was probably asked inadvertently.

The position that the appellants' demurrer to the supplemental bill should have been sustained, because it did not aver a demand of payment at the place where the bonds were payable, is without merit. No such ground is stated in the demurrer; which is special; and, had it been, it would have been unavailing. The insolvency of the company and its want of funds at the

place designated appear from the allegations of the bill; and, where such is the fact, no demand at the place is required. The law does not exact in such a case the performance of a fruitless act.

The objection that the decree covers property not embraced or intended to be embraced by the mortgages is equally untenable. The terms of the mortgages are as broad and comprehensive as could be used. They embrace all existing property of the company, except such surplus lands as were not required for the roadway, depots, and stations, and other uses of the road, and all its future property, both such as might be purchased with the proceeds of the bonds issued and such as might be acquired by other means. The language used is, " all the following, present, and in future to be acquired property of the parties of the first part" pertaining to the road; " that is to say, their road made and to be made, including the right of way and land occupied thereby, together with the superstructure and tracks thereon, and all rails and other materials used therein or procured therefor, inclusive of the iron rails purchased or to be purchased or paid for with the above-described bonds, or the money obtained therefor, and the machinery purchased with the same; bridges, viaducts, culverts, fences, depot-grounds and buildings thereon, engines, tenders, cars, tools, materials, machinery, and all other personal property, right thereto or interest therein pertaining as aforesaid, together with the tolls, rents, or income to be had or levied therefrom, and all franchises, rights, and privileges of the said parties of the first part of, in, to, or concerning the same; " with a proviso that the surplus lands mentioned might be sold.

The reference made in this description to the property which might be afterwards purchased with the bonds issued, does not operate as a limitation of the lien of the mortgage to such future-acquired property, but only to remove any doubt that might otherwise possibly arise whether the property thus purchased would also go to increase the security offered. We do not deem it of any moment whether the rolling-stock and machinery in use by the company at the date of the decree were acquired with the proceeds of the bonds or with the subsequent earnings of the company. A mortgage by a railroad company

which covers, in the terms of the two mortgages in suit, its engines, cars, and machinery, carries not only the cars, engines, and machinery in existence at the date of the mortgage, but such as take their place, or are subsequently added to them by the company, and are in existence at the time of the foreclosure. This kind of property is necessarily undergoing constant wear and consequent destruction ; and the mortgages in suit, so far as that property is concerned, would have been of little value if their lien did not extend to such as took its place, or was added to it by the company. *Pennock* v. *Coe*, 23 How. 117.; *Philadelphia, Wilmington, & Baltimore R. R. Co.* v. *Woelpper*, 64 Penn. St. 366 ; *Phillips* v. *Winslow*, 18 B. Mon. (Ky.) 431.

We perceive no error in the rulings of the court below.

*Decree affirmed.*

MR. JUSTICE HUNT did not sit in this case, nor take part in its decision.